Supreme Court—General Term—Second Department.

*May*, 1885.

## PEOPLE *v.* KIERNAN.

MURDER—EVIDENCE—CHARGE.

After defendant and deceased had retired into a room together, and had indulged in some dispute, defendant was heard to say to deceased, " One of us must die;" then came the report of defendant's pistol. Deceased ran out, said he was shot, and soon afterwards died. *Held* sufficient to establish premeditation and deliberation, and that the offense was murder in the first degree.

To establish premeditation no particular lapse of time is necessary. It is enough if there be time for choice as the result of reflection.

The trial judge charged the jury that the defendant, who had testified, " has, doubtless, every interest in this world to falsify, if falsifying would bring any immunity to him, and he is undoubtedly to be judged bearing that in mind, but he is not to be discredited for that reason." *Held*, no error.

There was but one jury box brought into court, from which the jurors were drawn, instead of the three prescribed by §§ 1050, 1051 and 1052 of the Code of Civil Procedure. *Held*, not to be an irregularity which could affect the rights of defendant, there having been a compliance with the law in the organization of the jury.

APPEAL by defendant, Patrick Kiernan, from a judgment of Court of Oyer and Terminer of Queens county, Hon. E. M. CULLEN presiding, of October 31, 1884, convicting defendant of murder in the first degree, and from orders denying a motion for a new trial and an arrest of judgment.

The facts appear to the opinion.

*H. A. Montfort* (*B. W. Downing*, of counsel), attorney for defendant, appellant.

*John Fleming*, district attorney, for the people, respondent.

DYKMAN, J.—The defendant has been convicted of murder in the first degree for killing Peter McCormick, and has appealed to this court from the judgment of conviction. There was no dispute about the commission of the deed, but the claim is that the crime was not murder in the first degree. But two witnesses speak of the transaction. One was an Italian, called by the public prosecutor, who seemed to understand our language imperfectly. He testified that he was at the house of McCormick on Sunday morning when defendant came and asked if McCormick was in, and witness said he was. Then the witness told McCormick that a gentleman wanted to see him, and he went into the dining-room and told the defendant to come in. The witness did not go in, but the defendant did, and as he entered the room he asked McCormick, "What are you going to do with me?" McCormick said, "I am going to put you out to-morrow morning." Between those words that were passed, he heard the report of a pistol. "He (defendant) said, 'You or me going to die,' and I heard the report of a pistol." He also testified that soon after, McCormick ran in the dining-room and kitchen way back again, and came alongside of the feet of the witness and said, "Ralph, I shot," and fell back as soon as he said the words at the side of the kitchen door and hallway, and did not speak after that. He further said that the defendant was not in the house more than two or three minutes. Mr. McCormick was arguing about the rent with the man. "I no understand what he said." There was argument about rent. Then the defendant left the house and was arrested soon after. On his person was found a pistol containing one loaded cartridge, three discharged chambers, and one chamber with no cartridge.

The other witness who speaks of the fatal event was the defendant himself, called in his own behalf. He testified that he owed McCormick some rent and offered to pay him Saturday night, but McCormick requested him to come to his house the next day, and that he went there thinking of no disturbance. Then he testified as follows: "I counted the money right out on the table, and he says, 'I won't take your rent now.' I said, 'How is that, Mr. McCormick, what is the matter?' 'Well,' he says, 'I won't take your money now, I am going to put you out in the morning.'

I says ' How is that, Mr. McCormick, ain't my money as good as any body else's to you?' Of course, I did not know what to make of it. He says, 'Well, I won't have you there; I am going to put you out.' Well, we had some words then, and I wanted to know the reason why he was going to put me out. I had always paid my rent, and I wanted to pay him, and I wanted to know the reason he would not take it. 'Well,' he says, 'I am going to let it to somebody else.' 'Well,' I says, ' if that is the way you are going to use me, and just after coming over here, only been here not quite two months yet, and going to put me out.' I says, ' You are a very mean man.' ' Well,' he says, ' now I am going to let it to somebody else,' and we had some words, and I called him a damned, mean, old scoundrel for doing it, and with that when I called him that, he made a bounce right for me quick, caught me right by the throat, and shoved me up in the corner past the door so I could not go out. He had me there striking me, and I thought then, of course, I wanted to get away from him the best way I could. Then the other man came out in the same door that Peter McCormick came out of too, and he had some weapon in his hand and he was going to strike me with it. I got scared then, and put my hand in my pocket. I did not know then that I had the revolver, but I found it was there and pulled it out. I pulled it out merely to scare the man ; I did not want to shoot him, I wanted to scare him so that I should get out of there. I wanted to get away from him, for I did not know what those two men were going to do with me in there, and he would not take my rent Saturday night." Q. " Did the pistol go off?" A. " The pistol went off." Q. " Did you intend to shoot him ?" A. " No, sir, nor I didn't intend to fire it off." .

The Italian witness was recalled, and denied what the defendant said respecting his entry into a room with a weapon of some kind, and denied that he saw any conflict between the men.

There was testimony respecting the previous good character of the defendant, which was not contradicted, and the case was submitted to the jury by a charge from the trial judge which fully and fairly explained the law, and the jury rendered a verdict of murder in the first degree.

The verdict, therefore, must be taken to manifest the fact that the statement of the defendant was rejected by the jury, and that the verdict was founded on the testimony of the Italian and the circumstances surrounding the tragedy. The effort from the first, has been to reduce the crime of the defendant below the first degree of murder, and for that purpose it is insisted that the death of McCormick was not the result of deliberation and premeditation. Already we have seen that the verdict of the jury was founded on the testimony of the Italian witness, and the circumstances that environ the transaction, to the exclusion of the testimony of the defendant in his own behalf. In that verdict, it might be assumed that after the defendant and his victim had retired to the room and had indulged in some dispute, the defendant said to the deceased, "One of us must die." Then came the report of the pistol, and the deceased ran out and said he was shot, and died at once from the effect of the shot. The pistol was found on the defendant when he was arrested, immediately after, with one chamber discharged.

From this small cluster of facts the crime is to be deduced and its grade determined. The foundation of the offense is established, but the intent of the defendant in its commission is the paramount question for determination.

On this subject it seems fair to infer from the portentous words of the defendant, that the intention to slay his victim was not formed under sudden impulse, for they indicate a deliberate design to take his life. They also indicate a determined purpose as the result of consideration.

How long such design held sway in the mind of the defendant is not material. The human mind acts with great celerity, and is capable of deliberation and meditation and the foundation of a purpose in the shortest space of time.

Deliberate is the opposite of sudden, and, as used in the statute under consideration, means well considered. Premeditation implies meditation beforehand, or previous deliberation, and while all this must transpire before the fatal act, by some appreciable space of time, yet no particular length of time is required. If there be time for choice as the result of reflection that is sufficient.

In this case the jury was justified in finding that the defendant had formed a deliberate design to kill his victim before he spoke the words, and those words expressed his final purpose and determination.

On the whole, the evidence was sufficient to bring the case within the statutory definition of murder in the first degree, and to justify the conviction so far as that question is involved.

Complaint is made of the severity of the remark of the trial judge to the jury that the defendant had every interest to falsify if that would secure immunity to him; but the remark was true, and gave the jury no information. Every member of the jury knew the fact as well as the judge, and the defendant was not injured by the remark.

After the deliberation which the importance of the case requires, we reach the conclusion that there was no error committed on the trial, or in the denial of the motions for a new trial and for arrest of judgment.

When the defendant was arraigned for trial there was an objection raised to the extra panel of one hundred and fifty trial jurors, on the ground that the names of such jurors were not drawn from the box or boxes by the court directed as by law required, and thereupon the county clerk, who was also clerk of the court, testified that there was only the one box to bring in and draw from; that, as the jurymen did their service, he placed their names in another box, but the box for drawing was only one box. Without stopping to inquire whether there was a complete technical compliance with the law in respect to the number of boxes provided by the clerk for the reception of the names of trial jurors, we conclude that there was a substantial compliance with the law in the organization of the jury, and if there were any irregularities they could not and did not affect the rights of the defendant, and were not prejudicial errors and must be disregarded. Ferris *v.* People, 35 *N. Y.* 125.

The conviction should be affirmed.

BARNARD, P. J., and PRATT, J., concur.